PeassoN, J.
 

 It was properly conceded upon the argument, tlxat, as the Montgomery land was not conveyed by the defendant, John ITarman, the debtor, the case does not come within the operation of 13 Elizabeth, Eev. Stat. ch. 50 sec. 1 act of 1715, which is construed and explained by act of 1840, Ire. Dig. Man. 195. It follows that the remedy of the plaintiffs, if they have any, is in this Court.
 

 The bill puts the equity of the plaintiffs upon the ground that the transfer of the note of $700 on Crawford by John Harman, the debtor, to his son the other defendant, was a fraudulent contrivance, whereby to put that part of his estate beyond the reach of creditors, and to enable the son to invest it in the Montgomery land, and that at the time of the trans•fer, John Harman was insolvent.
 

 The defendant, David G. Harman, admits that at the time the note on Crawford was transferred, his father was insolvent, and that the note was transferred to him for the purpose of being transferred to Montgomery in part payment for the land, but he avers that “in August, 1848, more than a year before the note was transferred, his father being then in good circumstances, and owning property greatly exceeding the amount of his debts, being desirous of advancing .him who was Ids youngest son, and just arrived at the age of twenty-one to
 
 an
 
 
 *180
 

 amount, equal in value to the advancements which he had made to his other sons and daughters in money or property,
 
 executed him a note for six hundred dollars.” That in November, 1849, his father paid off this note by an order on one Briggs, from whom he received $635 in cash, being the amount of his father’s note and interest for one year and three months: that soon afterwards his father, being in need of money, told the defendant that he had a note on Crawford for $700, due ten months after date, with which he could purchase the land of Montgomery as Avell as with cash, and it Aras agreed that he should take that note, deducting the interest, and let his father have the money. Accordingly, he took the note at $665, and paid his father therefor the $635 received of Briggs, and the balance in cash, making, in all, $665 ; and in January, 1850, he bought the land from Montgomery, and assigned to him the note on CraAvford in part payment.
 

 Admit, that in August, 1848, AAdien the father resorted to the most singular and unheard of mode of making an advancement to his son, by giving him a note for $600, due
 
 “
 
 one day after date,” with interest from date, professing to be for \Talue receAed, the father was solvent and OAvned more property than Avas sufficient to pay all the debts which he then OAved : say his land, negroes, &c., Avere Avorth $5,000, and his debts did not exceed $2,500, still there is this fact, i. e., the father had entered into speculations by purchasing seA'eral leases of gold mines, supposed to be very Araluable, at high prices, and AAdiich, as is stated in the ansAver, “turned out to be with him, as, defendant has been informed, it has turned out Avith many others, a
 
 mmious
 
 business ” — AAdiich strongly tends to shoAV that the father did not act
 
 Iona
 
 fide, and had a fraudulent intent in making this note to his son, to provide for future contingencies — add to this,' at the time the father gave the order on Briggs, and at the time he transferred the note on CraAvford, he was utterly insolvent, and the question is,1 could the son then in conscience, and AAdth a just regard to the rights of his father’s creditors, accept from him payment of the note AAdiich
 
 *181
 
 liad been executed without
 
 consideration ?
 
 Did he not know that his father was violating the maxim, “ one must be just, before he is allowed to be generous ?” If the father had been dead, a court of equity would have postponed the payment of this note until all the claims of creditors were satisfied. This doctrine is well settled, and the accident of the debtor’s being-alive and hopelessly insolvent, cannot affect the claims of creditors. But add to all this, that the reason which is set up in the answer, for the father’s resorting to this mode of making an advancement, viz, a desire to give' this son an amount equal in value to the advancements which he had made to his other sons and daughters in money or property, is proven to be false! To one daughter, the proof is, he had given nothing; to another, but a trifling amount; and in regard to the other children no proof is taken. So here is the suggestion of a falsehood. The conduct of the father and son is left without explanation, and they stand convicted of an attempt to withdraw, by a fraudulent contrivance, a portion of the father’s funds from the satisfaction of his debts.
 

 The bill seeks to treat the land purchased of Montgomery, as the property of John Ilarman, and to subject it to the payment of his debts. This equity is not sustained by the proofs. Daniel Gr. Ilarman purchased the land of Montgomery, and the fraud established is a conversion by the son, of the Crawford note, and its application in part payment for the land. The creditors have an equity to follow this note and to hold the land as a security for its payment, so that the amount with interest may be applied to- the satisfaction of their debts. A proper decree will be made to effect this purpose, but they are not entitled to treat Daniel G-. Ilarman as a trustee for them, and follow the land as upon a misapplication of a trust fund, for he never was their trustee, and their equity is to follow the note of Crawford, which their debtor attempted by collusion with his son, to place beyond their reach. See proceeding case,
 
 Gentry
 
 v. Harper, 177.
 

 Decree.